[No. G010769. Fourth Dist., Div. Three. Mar. 4, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES GILBERT LISPIER, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II of the Discussion, subtitled Sufficiency of the Evidence.

## COUNSEL

Stephen Gilbert, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis and Pamela Klahn, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SILLS, P. J.**—James Gilbert Lispier appeals his conviction of second degree robbery while using a firearm. He contends his pretrial statements to the police were improperly admitted, and the evidence was insufficient to support the robbery charge or the firearm enhancement. We affirm the judgment.

### FACTS

Just before noon on June 16, 1990, Gavin Jiles got out of his large silver pickup truck to go to work at a Newport Beach theater. A Hispanic man approached and asked him for the time. When he told him it was 11:20 a.m., the man pushed him back towards the opened door of the truck and yelled at him to get in. Jiles refused and the man responded with, "Shoot him! Shoot him!" At the same time, Jiles felt something pushed into his back. Turning, he could see a semiautomatic gun held by a Black man.

Jiles immediately obeyed. He climbed into the cab and slid across the bench seat to the passenger door. The Black man followed him and the Hispanic man brought up the rear. Once all three were inside the cab, the Hispanic man demanded the car keys from Jiles, and the Black man took his wallet. Laying the gun down on the seat between Jiles and himself, he rifled the wallet's contents. Jiles could clearly see the weapon, although he did not attempt to take it because he was outnumbered.

After the Hispanic man started the engine, the Black man ordered Jiles out of the truck because "[they did not] want a kidnaping rap." As soon as Jiles got out, the Black man slammed the door and they drove off. Jiles immediately called the police, told them of the robbery and described the gun to them. He admitted he was not overly familiar with firearms, but he had seen enough of them to recognize it as an automatic. Later, he decided it more

closely resembled a .45-caliber semiautomatic. It was painted over with black, and was badly scratched. After thinking about it for awhile, he wondered if it was real because it seemed almost too big to have been a real gun. At the time, however, it appeared real, and he thought it was real.

About two weeks later, Lispier was in custody for auto tampering in Santa Ana. He refused to talk about the auto tampering with the Santa Ana officers, and they terminated the interview. However, they later contacted the Newport Beach police because they knew Lispier and another man by the name of Guzman[1] were possible suspects in the earlier robbery.

When the Newport Beach police approached Lispier in the jail, he readily agreed to waive his rights and talk to them as long as the auto tampering case was not discussed. He was then fully advised of his *Miranda*[2] rights and waived them. Initially, he said he had not been in Newport Beach for years; then, he changed his story and admitted he participated in the robbery, but he had not held the gun, only driven the pickup. Next, he said he was not even in the truck when the robbery occurred, but had followed Guzman and the victim in his own car, and later received $100 worth of heroin for his part in the crime. He said Guzman's original plan was just to steal a car in Newport Beach, and he gave Guzman a ride to that area in exchange for $100 worth of heroin. On reflection, he decided Guzman did not even have a gun, but may have simulated one.

Jiles was unable to positively identify either Guzman or Lispier from photographs.[3] By the time trial commenced, 7 months had passed and Lispier's appearance had changed: He had gained 15 to 20 pounds, cleaned up, and cut his hair. Jiles could not positively identify him at trial either.

DISCUSSION

## I.  *The Confession*

Lispier contends his confession was erroneously admitted, having been obtained in violation of his Fifth Amendment rights to counsel and against self-incrimination. Noting the difference between the Sixth Amendment right to counsel which is "offense specific," and the Fifth Amendment

[1]Guzman was also in custody, and confessed to the crime. He pleaded guilty, however, on the first day of his joint trial with Lispier.

[2]*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[3]The police scheduled a lineup in the jail, but Lispier refused to participate because an attorney was not present to represent him at the lineup.

right to counsel which is not,[4] he argues the confession was obtained in violation of the Fifth Amendment because he invoked his right to silence after the Santa Ana arrest for auto tampering. Thus, the Newport Beach police could not even approach him to discuss *any* offense when they questioned him about the robbery.

■ Initially, we reaffirm the principle that a suspect's statement can only be *excluded* if it was obtained in violation of the federal constitutional guidelines; the only exception to this is when the issue involves the *substantive* state privilege against self-incrimination. If a substantive issue of the state privilege occurs, state judicial law preceding passage of Proposition 8 still controls.[5] (*People* v. *Markham* (1989) 49 Cal.3d 63, 68-69 [260 Cal.Rptr. 273, 775 P.2d 1042]; *People* v. *May* (1988) 44 Cal.3d 309, 316-317 [243 Cal.Rptr. 369, 748 P.2d 307].)

■ We hold that a general *Miranda* invocation is not the specific expression of the exercise of the right to counsel under *Miranda* which is a prerequisite to bar all contact by all police for all potential offenses. Furthermore, the issue of an invocation of *Miranda* rights is *remedial* in nature; it does not "deal with the scope of the right [against self-incrimination] itself . . . ." (*May, supra,* 44 Cal.3d at p. 318.) Thus, a suspect's statement, obtained by different police officers regarding an offense separate than that for which the suspect was originally arrested, and for which the suspect refused to waive his *Miranda* rights, can only be excluded if mandated by federal law.

■ In *Miranda,* the prophylactic rights designed to offset the "inherently compelling pressures" of custodial interrogation were established. To be

[4]Lispier concedes his statement does not violate his Sixth Amendment right to counsel because counsel had not been appointed for him on the charge when he confessed. (See, e.g., *People* v. *Mattson* (1990) 50 Cal.3d 826, 867 [268 Cal.Rptr. 802, 789 P.2d 983]; *McNeil* v. *Wisconsin* (1991) 501 U.S. __, __ [115 L.Ed.2d 158, 166-167, 111 S.Ct. 2204, 2207-2208.)

[5]In determining the effect of the passage of Proposition 8, known as the "Truth-in-Evidence" proposition, now incorporated in our Constitution as article I, section 28, subdivision (d), it was held that "the 'Truth-in-Evidence' provision of our Constitution was probably intended by the California voters as a means of (1) abrogating *judicial* decisions which had required the exclusion of relevant evidence solely to deter police misconduct in violation of a suspect's constitutional rights under the state Constitution, while (2) preserving *legislatively* created rules of privilege insulating particular communications, such as the attorney-client or physician-patient privilege. As we recently observed, 'The people have apparently decided that the exclusion of evidence is not an acceptable means of implementing those rights, *except as required by the Constitution of the United States.*' [Citation.]" (*People* v. *May, supra,* 44 Cal.3d at 318, original italics.) The result of this twofold purpose was a twofold test: If the exclusion of a suspect's statement was necessitated by a legislatively created privilege, or involved a substantive right under such a privilege, it was unaffected by the passage of section 28, subdivision (d). If the exclusion was necessitated by a mere remedial, judicially created device, designed to cure a constitutional violation, then section 28, subdivision (d), prohibited the exclusion unless mandated by federal law. (*Id.* at pp. 315-319.)

admitted against a suspect, a statement could not be the result of police questioning unless the suspect was adequately advised of, and waived, the privilege against self-incrimination and the right to the presence of retained or appointed counsel. (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 475 [16 L.Ed.2d at p. 724].) In *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880], the presence of appointed or retained counsel was further emphasized. *Edwards* prohibited *any* police questioning once a suspect invoked the specific right to counsel under *Miranda.* (*Id.* at pp. 484-485 [68 L.Ed.2d at p. 386]; *Arizona* v. *Roberson* (1988) 486 U.S. 675, 681-682 [100 L.Ed.2d 704, 713, 108 S.Ct. 2093].) Finally, in *McNeil* v. *Wisconsin, supra,* 501 U.S. __, __ [115 L.Ed.2d 158, 168, 111 S.Ct. 2204, 2208-2209, the *Edwards* stricture was clarified: A general refusal to waive *Miranda* rights was deemed insufficient to invoke the specific right to counsel necessitating the *Edwards* rule. "The rule of [*Edwards*] applies only when the suspect 'ha[s] *expressed*' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.* [Citation.] It requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" (*McNeil, supra,* 501 U.S. at p. __ [115 L.Ed.2d at pp. 168-169, 111 S.Ct. at p. 2209, original italics.)

In a slightly different context, a general invocation of the right to remain silent was deemed insufficient to raise the protection of *Edwards* and *Roberson* in *People* v. *Morris* (1991) 53 Cal.3d 152, 201-202 [279 Cal.Rptr. 720, 807 P.2d 949]. There, Morris and two women companions were arrested shortly after midnight. He invoked his right to remain silent at that time, and no interrogation occurred. Later that day, he gave an admission regarding a murder charge after requesting to talk with an officer. He was then arraigned on marijuana charges during which he requested appointment of counsel. The case was continued for two days for that appointment. That evening, an investigator approached Morris in the jail because they had been unable to locate the body in the area described by him in the earlier interview. Relying on *Roberson,* Morris contended his statements violated both his Fifth and Sixth Amendment rights. Not so. "[In *Roberson*] defendant clearly and unequivocally cut off all police interrogation, *specifically requested counsel,* and did nothing to initiate the interview with the officer. Here [Morris] initially invoked *only his right to silence and not to counsel*; initiated the police questioning about [the victim's] murder himself; and then expressly waived his right to counsel in making the prearraignment statement, . . ." (*People* v. *Morris, supra,* 53 Cal.3d at pp. 201-202, italics added.)

Without a clear and express invocation of the Fifth Amendment's right to counsel, the *Edwards-Roberson* doctrine does not operate to bar *any and all*

contact by state officers with the suspect. The *Edwards-Roberson* rule applies "only when the suspect 'ha[s] *expressed*' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.* . . ." (*McNeil, supra,* 501 U.S. at p. ___ [115 L.Ed.2d at p. 168, 111 S.Ct. at p. 2209], original italics.) That "assistance," of course, is the right to counsel during custodial interrogation.

Until a suspect affirmatively invokes the *Miranda* right to counsel during interrogation, the less stringent rule of *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321] applies. In *Mosley,* the suspect invoked his right to silence upon his arrest for a series of robberies. No interrogation occurred and Mosley did not mention any desire for counsel. A few hours later, a detective from another division of the same police department contacted Mosley regarding a robbery-murder, unconnected with the robberies for which he was originally arrested. The detective fully advised Mosley of his *Miranda* rights, which he waived. Mosley then denied any involvement in the robbery-murder, but later changed his mind and inculpated himself in the crime. "This [was] not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." (*Id.* at pp. 105-106 [46 L.Ed.2d at p. 322].)

■ The confession in *Mosley* was properly admitted, as was Lispier's. In both instances, the initial general invocation of the right to silence was respected by the original arresting officers, and all interrogation ceased. After a substantial period of time—a few hours in Mosley's situation and a few days in Lispier's—a separate officer contacted the suspect and asked him if he would discuss a crime separate from the one for which he had been arrested. In both cases, the suspects were fully cooperative and agreed to discuss the separate offense. They were both fully advised of their *Miranda* rights, which they waived.

■ But Lispier contends he *had* invoked his specific right to counsel immediately prior to the interrogation by the Newport Beach police. He focuses on his refusal to participate in a physical lineup; he refused because there was no attorney present for the procedure. Analogizing this refusal to be the equivalent of an *Edwards* invocation, he argues the Newport Beach police failed to scrupulously obey his right to counsel under *Miranda.*

We believe our Supreme Court's decisions in *People* v. *Morris, supra,* 53 Cal.3d 152 and *People* v. *Mattson, supra,* 50 Cal.3d 826 dispose of Lispier's contention. In *Morris,* the defendant had requested the appointment of counsel in court on a marijuana charge before a police officer contacted him to more fully discuss the murder case. The request for counsel in court on the marijuana charge did not constitute an invocation of the Fifth Amendment's right to counsel at the interrogation on the murder charge. Likewise, Mattson was arrested in Nevada for kidnapping and sexual assault charges. He received the *Miranda* rights, but no questioning occurred. Several days later, a detective from California contacted the Nevada officer regarding a kidnapping and sexual offense case from his jurisdiction. That afternoon, a physical lineup was conducted in Nevada. A deputy public defender was present for the lineup, although no attorney had actually been appointed as yet to represent Mattson. However, the deputy public defender signed a standard form, for which the signature line read, " 'Signature of Public Defender or attorney for suspect.' " (*Mattson, supra,* 50 Cal.3d at p. 857.) The investigator conceded that, had the deputy public defender complained of any aspect of the lineup, he would have accommodated him. Moreover, the public defender introduced himself to the lineup's participants as the attorney for Mattson, but he had not actually been appointed, and never was.

Mattson argued the confession he gave after this lineup was obtained in violation of his right to counsel. This contention was expressly rejected. A suspect's Sixth Amendment right to counsel does not come into existence until formal charges are actually brought. (50 Cal.3d at pp. 867-868.) As already discussed, the right to counsel under the Sixth Amendment is inherently and definitively different from that created under the Fifth Amendment and *Miranda. (McNeil, supra,* 501 U.S. at p. __ [115 L.Ed.2d at pp. 167-168, 111 S.Ct. at pp. 2208-2209].) They are not and cannot be interchangeable. (*Ibid.*) The Sixth Amendment guarantees the right to counsel at a physical lineup (*United States* v. *Wade* (1967) 388 U.S. 218, 236-238 [18 L.Ed.2d 1149, 87 S.Ct. 1926]), but the mere presence, or absence, of an attorney at a lineup does not affect the suspect's right to counsel during custodial interrogation, the specific right under the Fifth Amendment. Nor does it *equate* with the express request for counsel's presence during custodial interrogation which invokes the *Edwards-Roberson* rule.[6] (*McNeil, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 169, 111 S.Ct. at pp. 2209-2210; see *Mattson, supra,* 50 Cal.3d at pp. 868-869.)

Just because a criminal defendant invokes his Sixth Amendment right to counsel, it does not mean he is simultaneously invoking his Fifth Amendment right on a separate case. In *Morris,* the defendant had requested

---

[6]"The *Edwards* rule, moreover, is *not* offense-specific: once a suspect invokes the *Miranda* right to counsel *for interrogation* [italics added] regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present. [Citation.]" (*McNeil, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 168, 111 S.Ct. at p. 2208.)

appointment of counsel in court on marijuana charges, but that did not equate with an express invocation of counsel before interrogation on the murder case. That rule holds true here as well. Even Lispier treated the two rights separately at the time, as evidenced by his waiver of his Fifth Amendment right to counsel a short time after his request for counsel under the Sixth Amendment at the lineup. Accordingly, Lispier's statement was properly admitted.

II. *Sufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . .

III. Disposition

The judgment is affirmed.

Crosby, J., and Sonenshine, J., concurred.

---

*See footnote, *ante*, page 1317.