Demetrius Maurice WILSON,
Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

No. 2004–SC–000800–MR.

Supreme Court of Kentucky.

Aug. 24, 2006.

Margaret Foley Case, Appeals Branch Manager, Department of Public Advocacy, Shelly R. Fears, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Kristin N. Logan, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, Counsel for Appellee.

ROACH, Justice.

## I. INTRODUCTION

Appellant, Demetrius Maurice Wilson, was convicted of murder and sentenced to twenty-one years in prison. He now contends that the trial court erred (1) by refusing to suppress certain statements he made to police after his arrest, and (2) by admitting evidence of Appellant's prior bad acts. Finding no error, we affirm Appellant's conviction.

## II. BACKGROUND

During the early morning hours of August 8, 2003, Captain Ed McManus of the Paducah Police Department was conducting a traffic stop near an area of downtown Paducah known as "The Set" when he heard a series of three gunshots, followed by a fourth gunshot about thirty seconds later. McManus called for backup, dismissed the traffic offender, and went to investigate the gunshots.

Officer Tim Melton responded to Mc-Manus's request for backup, and arrived at "The Set" shortly after receiving the call. A large number of people were fleeing the area. After a brief search of the area, the officers located the victim, Reginald Knox, behind a nearby building. Mr. Knox had been shot, but was still breathing. The officers checked him for a weapon or identification, and found neither. Mr. Knox was then transported to the hospital where he later died from his injuries.

Following a short preliminary investigation by Detective Brian Krueger and other members of the Paducah Police Department, Appellant became a suspect in the shooting. Detective Krueger and the other officers "put out word" that they wanted to interview Appellant. The Monday morning immediately following the crime, Appellant's stepfather contacted Detective Krueger and made arrangements for Appellant to come in for an interview. Later that morning, Appellant, along with his mother, stepfather, and uncle arrived at the Paducah Police Department, where Detective Krueger and Detective Danny Carroll first interviewed Appellant.

In the course of this first interview, Appellant told police that he had been at "The Set" on the night of the crime and had gone behind a building to urinate. He further stated that while he was behind the building, someone put a gun to his head and demanded the contents of his pockets. Appellant claimed that after a brief scuffle the alleged robber, who turned out to be Mr. Knox, fired two shots at Appellant. Appellant said that he then fired two shots at Mr. Knox, and that Mr. Knox fired a final shot at Appellant.

After this interview, Appellant and his family members at the police station accompanied police to "The Set," where Appellant walked police through the area, explaining his version of the events of Au-gust 8, 2003. Afterwards, the officers told Appellant that his story was not consistent with evidence from the crime scene. The police further intimated that "The Set" was equipped with video cameras, which had recorded the events of August 8, though no such video equipment existed. The police then suggested that Appellant and his family go to lunch to think things over and return in the afternoon.

Upon returning from lunch, Appellant's stepfather informed Detective Krueger that the family had consulted with an attorney, who advised Appellant not to speak with police. Appellant repeated this claim to another officer, stating further that if the police wished to speak with him, they should contact his attorney. After making this statement, Appellant was immediately arrested and taken into an interview room at the police station.

Once in the interview room, police officers read Appellant his *Miranda* rights, which Appellant said he understood. The officers then asked Appellant if he wished to make another statement. Appellant began to give a statement that was inconsistent with those made in his first interview. In this second statement, Appellant again claimed that he was urinating behind a building when Mr. Knox walked up and put a pistol to his head. However, Appellant then stated that Mr. Knox struck him in the head with the gun, knocking Appellant to the ground. Appellant claimed Mr. Knox began to hit him, took items from Appellant's pockets, and then fled. Appellant got up, chased after Mr. Knox, and fired three shots from his own gun. Appellant said he then heard two more gunshots, at which point he fired another shot and saw Mr. Knox fall to the ground. Appellant stated he then threw his revolver into an adjacent grassy area and ran home.

Appellant was indicted for murder on September 5, 2003. Following a two-day trial in July 2004, the jury found Appellant guilty of intentional murder. After a brief penalty phase, he was sentenced to twenty-one years in prison. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## III. ANALYSIS

We address the issues in the order in which they appear in Appellant's brief.

### A. Suppression of Statements to Police

Appellant first claims that his pretrial motion to suppress the statements he made to police following his arrest should have been granted. He argues that the statements should have been suppressed because he had invoked his Fifth Amendment right to remain silent and right to counsel before his arrest and subsequent interview. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also claims that he did not knowingly, intelligently, and voluntarily waive these rights before making his second statement to police. The Commonwealth argues that Appellant's Fifth Amendment rights had not attached when he attempted to invoke them, and that his alleged invocation represented a request for counsel that was ambiguous at best.

■ In reviewing a ruling on a motion to suppress, the trial court's findings of fact are conclusive if supported by substantial evidence. RCr 9.78; *see also Talbott v. Commonwealth,* 968 S.W.2d 76, 82 (Ky.1998). This court then reviews de novo the application of the law to the facts. *Welch v. Commonwealth,* 149 S.W.3d 407, 409 (Ky.2004).

■ We agree that if Appellant had validly invoked his *Miranda* rights at the police station before his second statement was made, further interrogation by police would have been inappropriate, requiring the suppression of any subsequent statements. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ("We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."). However, we agree with the Commonwealth's contention that Appellant's rights to silence and counsel had not yet attached when he attempted to invoke them upon returning to the police station, because he was not in custody. Thus, Appellant did not, and indeed could not, invoke his *Miranda* rights at that time.

Though the United States Supreme Court has not specifically held that a suspect cannot anticipatorily invoke his *Miranda* rights, the Court has stated in a footnote:

We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation"—which a preliminary hearing will not always, or even usually, involve. If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will

allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

*McNeil v. Wisconsin,* 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 2211 n. 3, 115 L.Ed.2d 158 (1991) (citations omitted).

██ A number of jurisdictions have relied on this footnote to hold that *Miranda* rights do not attach outside the context of custodial interrogation, and that a suspect therefore cannot invoke those rights unless he or she is subject to custodial interrogation. *See United States v. Vega–Figueroa,* 234 F.3d 744, 749 (1st Cir.2000) (stating that "[i]n order for *Miranda* rights to be invoked, there must be (1) custody and (2) interrogation"); *Alston v. Redman,* 34 F.3d 1237, 1244 (3rd Cir.1994), *cert. denied,* 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995) ("Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated."); *Burket v. Angelone,* 208 F.3d 172, 197 (4th Cir.), *cert. denied,* 530 U.S. 1283, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2000) (holding that a defendant may not invoke the protections provided by *Miranda* when he was not in custody); *United States v. Wyatt,* 179 F.3d 532, 537 (7th Cir.1999) ("The Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody, even if in anticipation of future custodial interrogation." (citations omitted)); *United States v. LaGrone,* 43 F.3d 332, 337 (7th Cir.1994) ("The *Miranda* right to counsel attaches only in the context of custodial interrogation."); *United States v. Grimes,* 142 F.3d 1342, 1348 (11th Cir. 1998), *cert. denied,* 525 U.S. 1088, 119 S.Ct. 840, 142 L.Ed.2d 695 (1999) ("We ... hold that *Miranda* rights may be invoked only during custodial interrogation or when interrogation is imminent."); *People v. Avi-*la, 75 Cal.App.4th 416, 89 Cal.Rptr.2d 320, 325 (Cal.Ct.App.1999) ("Allowing an anticipatory invocation of the *Miranda* right to counsel would extend an accused's privilege against self-incrimination far beyond the intent of *Miranda* and its progeny."); *Sapp v. State,* 690 So.2d 581, 586 (Fla. 1997) (requiring "the invocation to occur either during custodial interrogation or when it is imminent"); *State v. Aubuchont,* 147 N.H. 142, 784 A.2d 1170, 1177–78 (2001); *State v. Warness,* 77 Wash.App. 636, 893 P.2d 665, 668 (1995) ("[T]he Fifth Amendment right to counsel cannot be invoked by a person who is not in custody."); *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456, 467 (1995) ("[T]he *Miranda* right to counsel has no applicability outside the context of custodial interrogation."). The Illinois Supreme Court has ably expressed the theory behind the rule against anticipatory invocation of the Miranda rights as follows:

> We agree with the reasoning of these federal and state cases. It is not surprising that virtually every Supreme Court opinion involving *Miranda* has used the phrase "custodial interrogation." It is custodial interrogation with which *Miranda* was concerned. It is the right to an attorney *during custodial interrogation* that *Miranda* and its progeny protect[ ]. That right does not exist outside the context of custodial interrogation. One cannot invoke a right that does not yet exist.

*People v. Villalobos,* 193 Ill.2d 229, 250 Ill.Dec. 17, 737 N.E.2d 639, 645 (2000). In light of these cases, it is clear that the Fifth Amendment rights protected by *Miranda* attach only after a defendant is taken into custody and subjected to interrogation. Any attempt to invoke those rights prior to custodial interrogation is premature and ineffective.

■ To determine whether a suspect is in custody for the purposes of *Miranda*, a court must consider the totality of the circumstances. But "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 320, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)); *see also Gomez v. Commonwealth*, 152 S.W.3d 238, 241–242 (Ky.App.2004). The circumstances surrounding Appellant's attempted invocation of his *Miranda* rights indicate that he was not under formal arrest and that his freedom of movement was not restrained.

■ Appellant argues that because he was arrested immediately after invoking his *Miranda* rights, his freedom was in effect restrained at the time he asserted those rights. However, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). Therefore, the intentions of police are irrelevant and the inquiry into whether Appellant was in custody turns on whether a reasonable person in a similar situation would have believed that he or she was free to leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

There is no evidence that Appellant's freedom of movement was in any way restrained when he entered the police station and allegedly invoked his rights to silence and counsel. Most compelling is the fact that Appellant made this "invocation" when he voluntarily returned to the police station after having been allowed to go to lunch with his family. Under these circumstances, a reasonable person would have felt free to leave. Thus, we conclude that Appellant was not in custody when he attempted to invoke his *Miranda* rights to silence and counsel. For that reason Appellant's *Miranda* rights had not yet attached, and he could not at that time make a valid assertion of those rights. Appellant did not invoke his rights after being arrested. Thus, the statements he made after being taken into custody were not obtained in violation of his Fifth Amendment rights, and the trial court did not err in denying Appellant's motion to suppress the statements.

## B. Prior Bad Acts

■ Appellant also claims that improper character evidence was admitted against him at trial, in violation of KRE 404(b). Specifically, Appellant asserts that the evidence of his statement that Mr. Knox robbed him of "money and weed," introduced through the testimony of Detective Krueger, is unduly prejudicial character evidence and therefore should not have been admitted at trial. Appellant argues that evidence of his possession of marijuana on the night of the shooting should not have been admitted because it was offered only to show criminal predisposition. The Commonwealth argues that the marijuana evidence fits the motive exception to the rule against character evidence contained in KRE 404(b)(1).

■ In determining the admissibility of other crimes evidence under KRE 404(b), a court must engage in an analysis of the relevance of the evidence, the probative value of the evidence, and prejudice to the defendant. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky.1994).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination

of the action more probable or less probable than it would be without the evidence." KRE 401. In this instance, the marijuana evidence was relevant because it tended to make the prosecution's theory that the shooting incident stemmed from a "drug deal gone bad" more probable. Further, the evidence also indicated that the shooting was intentional, rather than the result of a mere attempt to frighten the victim.

■ The inquiry into the probative value of the evidence turns on whether evidence of a prior bad act or uncharged crime is "sufficiently probative of its commission by the accused to warrant its introduction into evidence." *Bell*, 875 S.W.2d at 890. In the present case, the challenged evidence consisted only of Detective Krueger's recitation of Appellant's own statement as to what Mr. Knox allegedly had taken from him in the course of the robbery. Because the challenged evidence was Appellant's own admission that he committed the prior bad act, it is clearly probative of the fact that Appellant did in fact possess marijuana on the night of the shooting. The statement is sufficiently probative to warrant its introduction into evidence.

■ The third step in determining the admissibility of prior bad acts is to balance the probative nature of the evidence and the potential prejudice to the defendant from its introduction. *Daniel v. Commonwealth*, 905 S.W.2d 76, 78 (Ky.1995). Appellant argues that the evidence that he possessed marijuana is unfairly prejudicial, and was introduced only to portray Appellant as an unsavory person who would be more likely to commit murder. We disagree. While possession of marijuana is a serious crime, evidence of such a crime is not so prejudicial as to preclude its introduction for the purpose of establishing a motive for a murder.

■ The burden is on the Commonwealth to show both that the evidence fits within an exception to the rule against character evidence, and to demonstrate that the probative nature of the evidence substantially outweighs its prejudicial effect. *Daniel v. Commonwealth*, 905 S.W.2d 76, 78 (Ky.1995); *Funk v. Commonwealth*, 842 S.W.2d 476, 480 (Ky.1992). The Commonwealth met this burden by showing that the evidence of Appellant's possession of marijuana on the night of the shooting—marijuana that he claims Mr. Knox stole from him—was offered to establish his motive for shooting Mr. Knox. *See Adkins v. Commonwealth*, 96 S.W.3d 779, 792–793 (Ky.2003) ("Evidence of drug use is not probative of a propensity to commit homicide, robbery, or burglary, and this evidence was not introduced for that purpose. Instead, evidence of Appellant's cocaine possession and of his fear of the police 'because of drugs' was relevant to prove a motive for the homicide, robbery, and burglary, a purpose explicitly authorized by KRE 404(b)(1)." (citation omitted)). The Commonwealth's use of the evidence therefore clearly falls within the exceptions to the rule against character evidence listed in KRE 404(b)(1).

We therefore hold that the trial court did not err by admitting the evidence that Appellant possessed marijuana on the night of the shooting.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the McCracken Circuit Court is affirmed.

All concur.